IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| (1) | Billy Joe Altstatt, as brother and Guardian, of Johnny Altstatt, an incapacitated person, | ) ) ) | |
| | Complainant; | ) ) | |
| v. | | ) ) ) | CASE NO. <u>CIV-22-811-D</u> |
| | | | JURY TRIAL DEMANDED & ATTORNEY LIEN CLAIMED |
| (1) | Board of County Commissioners for Oklahoma County; | ) ) ) ) | |
| (2) | The Oklahoma County Jail Trust; | ) ) ) | |
| (3) | KEVIN CALVEY, in his individual capacity as an Oklahoma County Commissioner, and a member of the Oklahoma County Jail Trust; | ) ) ) ) ) ) ) | |
| (4) | CARRIE BLUMERT, in her individual capacity; | ) ) ) ) ) ) | |
| (5) | BRIAN MAUGHAN, in his individual capacity; | ) ) ) ) ) ) | |
| (6) | SUE ANN ARNALL, in her individual capacity as a Member of the Oklahoma County Jail Trust; | ) ) ) ) | |

1

(7)  JOE ALLBAUGH, in his                 )
     individual capacity as a             )
     Member of the Oklahoma               )
     County Jail Trust;                   )
                                          )
                                          )
(8)  FRANCIE EKWEREKWU, in                )
     her individual capacity as a         )
     Member of the Oklahoma               )
     County Jail Trust;                   )
                                          )
                                          )
(9)  TODD LAMB, in his individual         )
     capacity as a Member of the          )
     Oklahoma County Jail Trust;          )
                                          )
                                          )
                                          )
(10) JIM COUCH, in his individual         )
     capacity as a Member of the          )
     Oklahoma County Jail Trust;          )
                                          )
                                          )
(11) BEN BROWN, in his individual         )
     capacity as a member of the          )
     Oklahoma County Jail Trust;          )
                                          )
                                          )
(12) M.T. BERRY, in his individual        )
     capacity as a member of the          )
     Oklahoma County Jail Trust;          )
                                          )
                                          )
(13) TOMMIE WILLIAMS III in his           )
     individual capacity;                 )
                                          )
                                          )
(14) KEVIN WAGNER, in his                 )
     individual capacity;                 )
                                          )
(15) GREG WILLIAMS, in his                )
     individual capacity;                 )

2

**COMPLAINT**

Billy Joe Altstatt, as brother and legal Guardian of Johnny Altstatt[1], an incapacitated person, for the causes of action against the above-named Defendants, states and alleges as follows:

**I.**
**INTRODUCTION**

1.     This action seeks declaratory relief from the court arising from unconstitutional conditions of confinement at the Oklahoma County Detention Center ("OCDC") pursuant to 28 U.S.C. § 2201, such conditions being  pervasive, long-standing, and well documented by jail personnel, county policy makers, and citizen appointees, these unconstitutional conditions including deliberate indifference to the danger of violence that faces inmates daily due to inadequate funding, understaffing, and inadequate supervision of inmates, causing rampant inmate-on-inmate violence;

2.     Specifically, Plaintiff seeks a declaration that the conditions of confinement at the OCDC caused serious and permanent injuries to Johnny Altstatt and deprived him of his fundamental constitutional right to safety and bodily integrity while in pretrial custody;

3.     Plaintiff also seeks damages from each Defendant arising from the deliberate indifference each has shown to the known dangers faced by inmates on a daily basis, such danger being the prevalence of inmate-on-inmate violence, and the dangers of being physically assaulted while incarcerated at the Oklahoma County Detention Center;

---

[1] PG-2022-436 District Court of Oklahoma County

4.      Johnny Altstatt, as a pre-trial detainee at the time he suffered his injuries, was protected by the Fourteenth Amendment of the Constitution of the United States, made actionable pursuant to 42 U.S.C. § 1983.

## II.
## PARTIES, JURISDICTION, AND VENUE

5.      Billy Altstatt is the brother and legal Guardian of Johnny Altstatt, an incapacitated person, and brings these causes of action for and on behalf of his Ward, Johnny Altstatt.

6.       The Board of County Commissioners for Oklahoma County ("Board") is the legislative entity, sitting in Oklahoma County, Oklahoma, with non-delegable statutory responsible for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe keeping of inmates.

7.      57 O.S. § 41 provides that "[e]very county, by authority of the board of county commissioners *and at the expense of the county*, shall have a jail or access to a jail in another county for the safekeeping of prisoners lawfully committed".

8.      Brian Maughan, Carrie Blumert, and Kevin Calvey, are individual members of the Board and the Board sits and takes actions on behalf of Oklahoma County in Oklahoma City, Oklahoma.

9.      Brian Maughan, Carrie Blumert, and Kevin Calvey are the individually elected members of the Oklahoma County Board of County Commissioners;

10.     Brian Maughan, Carrie Blumert, and Kevin Calvey were members of the Oklahoma County Board of County Commissioners when Johnny Altstatt was injured at the Oklahoma County Detention Center;

11.     Brian Maughan, Carrie Blumert, and Kevin Calvey each reside in Oklahoma County;

12.     The Oklahoma County Jail Trust sits in Oklahoma County, Oklahoma;

13.     Sue Ann Arnall is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

14.     Joe Allbaugh is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

15.     Francie Ekwerekau is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

16.     Todd Lamb is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

17.     Jim Couch is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

18.     Ben Brown is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

19.     M.T. Berry is a member of the Oklahoma County Jail Trust, and resides in Oklahoma County;

20.     Tommie Williams III is the elected Sheriff of Oklahoma County and was sworn into office on January 5, 2021.

21.    Kevin Wagner was the lead supervisor on duty on March 15, 2021, when Johnny Altstatt was assaulted;

22.    Greg Williams is the Administrator of the Oklahoma County Detention Center and is responsible for the day-to-day management of the facility, and resides in Oklahoma County.

23.    Pursuant to 57 O.S. §47, Tommie Williams III is responsible for jail operations. Tommie Williams III is sued in both his official and individual capacities.

24.    On February 15, 2022, Complainant served a notice of tort claim on Board, and the Board has taken no action on the Tort Claim;

25.    Complainant has satisfied all prerequisites to filing suit, and all of the actions discussed below occurred in Oklahoma County, Oklahoma, making jurisdiction and venue proper in the Western District of Oklahoma.

### III.
### STATEMENT OF MATERIAL FACTS RELEVANT
### TO ALL CAUSES OF ACTION

26.    Johnny Altstatt was incarcerated at the Oklahoma County Detention Center, located at 201 North Shartel, Oklahoma City, Oklahoma, during the month of March, 2021;

27.    Johnny Altstatt was a person of normal, average intelligence prior to his incarceration in March, 2021, at the Oklahoma County Detention Center;

28.    Johnny Altstatt was an average able-bodied adult, able to care for himself, prior to his incarceration in March, 2021, at the Oklahoma County Jail;

29.    Johnny Altstatt was living independently prior to his incarceration in March, 2021, at the Oklahoma County Jail;

6

30.     Johnny Altstatt was placed into a cell with Joseph Defreeze on March 15, 2021;

31.     Kevin Wagner was the ranking officer in charge on March 15, 2021;

32.     Kevin Wagner was aware of a shortage of staff on March 15, 2021, and had complained about staff shortages to his supervisors, and to other staff members prior to March 15, 2021;

33.     Kevin Wagner had discussed the dangers of understaffing with his supervisors and with other staff members, prior to March 15, 2021;

34.     Multiple detention officers had discussed with supervisors and amongst themselves the danger created by understaffing the pods prior to March 15, 2021;

35.     On March 15, 2021, Joseph Defreeze told Johnny Altstatt that he (Joseph Defreeze) would eat all of the meals delivered daily to himself and he would also eat all meals delivered to Johnny Altstatt, and if Johnny Altstatt objected, he (Joseph Defreeze) would beat him to death;

36.     Johnny Altstatt called the Oklahoma County Detention Center "camera ops", which is designed to allow inmates to call for assistance, and reported to the officer on duty at "camera ops" that he had been threatened with physical violence by his cellmate, Joseph Defreeze;

37.     On March 15, 2021, the jail was critically understaffed;

38.     Each floor of the jail has four (4) pods, and each pod has multiple cells;

39.     There was no pod officer assigned to the pod in which Johnny Altstatt was celled;

40.     There were no pod officers immediately available to the floor on which Johnny Altstatt was celled.

41.     There was no officer assigned to video surveillance in Johnny Altstatt's pod.

42.     There was no direct or indirect supervision of the inmates on the floor, or the pod where Johnny Altstatt was celled with Joseph Defreeze;

43.     Kevin Wagner was aware, as were officers who knew Joseph Defreeze, that he had a history of violence and sexual assault against other inmates;

44.     In the time it took officers to respond to the call for help, Joseph Defreeze had beaten Johnny Altstatt severely and had sexually assaulted Johnny Altstatt;

45.     When jailers arrived, Joseph Defreeze was on top of Johnny Altstatt, naked, and was placing his penis in Johnny Altstatt's mouth.

46.     The first responding officer ordered Joseph Defreeze to stop the assault but Joseph Defreeze continued to beat Johnny Altstatt, and critically injured Johnny Altstatt because the first responding officer would not intervene physically without other officers' present;

47.     When additional officers finally arrived, Johnny Altstatt was so severely injured that he was taken by ambulance to the hospital, where he remained in critical condition for weeks;

48.     To illustrate the seriousness of the injuries, PLAINTIFF quotes the perpetrator of what happened, Joseph Lance De Freeze, as he provided his accurate description of what happened at that time:  **"I beat the fu-k out him! Get the fu-k out of my face."**

8

49.     Additional information taken from Sheriff Department Reports on this matter show that on March 15, 2021, at 0223 CPL Alleman received a call from camera ops to respond to 12th Floor David Pod Cell 01 on a possible inmate on inmate altercation. On arrival CPL Alleman observed inmate Joseph Lance De Freeze, DOB: 04/04/1983 on top of inmate Johnny Altstatt, naked, striking him repeatedly with his fists. CPL Alleman issued a call for assistance on his handheld radio and gave De Freeze verbal commands to get off of Johnny Altstatt immediately.   CPL Alleman articulates in his report that De Freeze ignored his verbal commands and continued to strike Altstatt.

50.     CPL Alleman again gave De Freeze verbal commands to remove himself from Altstatt while he radioed for backup, De Freeze momentarily stopped beating Altstatt and engaged in verbal dialogue with CPL Alleman. De Freeze verbalized out loud that he was sorry to CPL Alleman and that his clothing was underneath Johnny Altstatt.

51.     Jail personnel failed to notify Johnny Altstatt's attorney, or any of Johnny Altstatt's family members of his status in critical condition at a hospital.

52.     Medical records reflect the following: On 03/19/2021 Altstatt was transferred from Intensive Care at OU Medical Center to the 5th Floor recovery in room 5571. An investigator went to OU Medical Center and attempted to speak with Altstatt on 03/19/2021 at 0845 hours however, Altstatt was not conscious at this time.

53.     Johnny Altstatt was discharged from OU Medical Center on March 29, 2021, and immediately returned to the Oklahoma County Detention Center.   His Discharge Summary was:

1. S/P ASSAULT 2. RIGHT MANDIBULAR CON DYLE
SUBLUXATION 3. BILATERAL NASAL BONE FX 4. FOREHEAD
LACERATION 5. RIGHT AURICULAR HEMATOMA 6. RIGHT PINNA
LACERATION 7. POSSIBLE CHRONIC SDH 8. RIGHT PERIORBITAL
EDEMA 9. RIGHT HTX/PTX 10. RLL PULMONARY CONTUSIONS 11.
RIGHT RIBS 6-12 FX (FLAIL 9-11) 12. ACUTE RESPIRATORY
INSUFFICIENCY, IMPROVED 13. DYSPHAGIA NOS 14. AGITATION
15. INSOMNIA 16. INCIDENTAL

54.     When Johnny Altstatt was returned to the jail, he was placed back into the
same pod with Joseph Defreeze.

55.     Johnny Altstatt was again abused by Joseph Defreeze on return to the
Oklahoma County Detention Center.

56.     Plaintiff brings this action under Fourteenth Amendment, which is Applicable
to the states through the Fourteenth Amendment, and which applies to pre-trial detainees.

57.     The Eighth Amendment provides the analytical framework for addressing
Fourteenth Amendment claims of a pre-trial detainee. *See Craig v. Eberly,* 164 F.3d 490,
495 (10th Cir.1998));

58.     Prison officials have a duty to provide humane conditions of  Confinement
and ensuring adequate food, clothing, shelter, and medical care, as well as taking
"reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S.
517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

59.     The Eighth Amendment test for constitutional liability of prison officials
contains both an objective part and a subjective part.

60.     The objective component of the Eighth Amendment test requires a Plaintiff
to show that he is "incarcerated under conditions posing a substantial risk of serious

harm." This includes "official conduct that is 'sure or very likely to cause' serious injury at the hands of other inmates." *Benefield v. McDowall,* 241 F.3d 1267, 1272 (10th Cir.2001).

61.     The subjective component of the Eighth Amendment test requires a Plaintiff to show that Defendants had the culpable state of mind known as "deliberate indifference" *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

62.     This standard is a middle ground that lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."   Id.

63.     Deliberate indifference exists when an official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837, 114 S.Ct. 1970. This subjective standard of disregard of a known risk is equivalent to criminal recklessness. *See id.* at 836–37, 114 S.Ct. 1970.

64.     Knowledge by a prison official may be demonstrated by circumstantial evidence, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious."  *Id.* at 842, 114 S.Ct. 1970.

65.     Furthermore, an inmate "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a *substantial risk* of serious harm." *Id.* (emphasis added).

66**.**     A plaintiff states a claim for deliberate indifference against a county's legislative body by producing evidence from which a reasonable inference can be drawn that "county commissioners failed to provide funding for correction of deficiencies ….

likely to lead to assaults against inmates". *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999) (there is evidence that the county's legislative body was deliberately indifferent to conditions at the jail).

67.     Pursuant to Oklahoma law, every Board of County Commissioners has a constitutional duty to provide for its jail. *Bryson v. Oklahoma County ex rel. Oklahoma County Detention Center*, 1261 P.3d 627, 637, 2011 OK CIV APP 98.

68.     The Boards of County Commissioners also have a statutory duty to provide for the safekeeping "of prisoners lawfully committed".  57 Okla.Stat. § 41.

69.     "[B]ecause the necessary maintenance of a jail is a constitutional duty, a county must first appropriate funds for such [constitutional] duty and any other constitutional duties before any county funds are expended for statutory duties or other functions."   *Wright v. Stanley*, United States District Court, W.D. Oklahoma, June 8, 2015, Not Reported in F.Supp.3d, 2015 WL 3606390 (citing  Okla. A.G. Opin., No. 07–35, 2007 WL 4699709 (Oct. 23, 2007)).

70.     Staffing that is insufficient to provide adequate security to inmates and staff may contribute to an Eighth Amendment violation. *Ramo v. Lamm,* 639 F.2d 559, 572 (10th Cir. 1980).

71.     Evidence that the inmate population is "plagued with violence and the Fear also supports an Eighth Amendment claim. *Ramos*, 639 F.2d 559, 593.

72.     It is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement**.** *Smith v. Sullivan***,** 611 F.2d 1039**,** 1043-44 (citing E. g., *Williams v. Edwards*, 547 F.2d 1206, 1212-13 (5th Cir. 1977); *Gates v.*

*Collier*, 501 F.2d 1291, 1319-20 (5th Cir. 1974); *Mickens v. Winston,* 462 F.Supp. 910, 912 (E.D.Va.1978); *Inmates of Boys' Training School v. Southworth,* 76 F.R.D. 115, 119 (D.R.I.1977)).

73.     Oklahoma County Board of County Commissioners has created a Budget Board to review and approve the proposed budgets for each county office each year.

74.     The Oklahoma County Budget Board is made up of the elected officials for Oklahoma County, including Brian Maughan, Carrie Blumert, Kevin Calvey, and Tommie Johnson III.

75.     The County Elected Officials has established a team of finance and management staff to assist in evaluation of the budget requests and budget process improvements.

76.     The "team" referred to in para.75 consists solely of persons appointed by the members of the Budget Board, and the "team" reviews each proposed budget as submitted, and makes recommendations to the Budget Board as to how county monies should be spent;

77.     When the budget sub-committee meets, they engage in discussions about the budgets of each office, specifically the jail budget.

78.     The members of the budget sub-committee "team" receive information every year that is directly related to the under-staffing of the jail, the under-funding at the jail, the meager salaries of jail detention staff, and the dangers created by the lack of funding and staffing levels at the jail;

79.     The members of the budget sub-committee report back to the elected officials that each respectively represents, informing them of the issues outlined in the foregoing paragraph.

80.     The elected County Commissioners adopt the finalized budget and submit it to the County Excise Board for their approval.

81.     For the years 2017 to 2020, the budget of the Oklahoma County Court Clerk increased by approximately thirty-three percent (33%).

82.     For the years 2017 to 2020, the budget of the Oklahoma County Assessor increased by approximately fifteen percent (15%).

83.     For the years 2017 to 2020, the budget of the Oklahoma County Treasurer increased by approximately thirty percent (30%).

84.     For the years 2017 to 2020, the budget of the Court Services department of the County increased by thirty percent (30%).

85.     For the years 2017-2020 the budget allotted to jail services increased minimally.

86.     For the years 2017-2021, the Board of County Commissioners has spent millions of dollars on non-constitutionally mandated projects such as: remodeling the jury assembly room, remodeling courtrooms, building new luxurious office spaces for each of the county commissioners, new offices for the District Attorney, new spaces for District Attorney investigative staff, new witness center for the District Attorney, new office space for the County Clerk, remodeled spaces for the County Treasurer, new roads to allow interstate entrance ramps for certain neighborhoods;

14

87.     The money spent in the above paragraph could have been used to hire many additional personnel to staff the jail and to increase camera scope, monitoring, and efficiency.

88.     Each County Commissioner, Brian Maughan, Carrie Blumert, and Kevin Calvey has made public and private statements about the extreme lack of funding at the jail, and the extreme dangers at the jail created by the lack of funding.

89.     Each County Commissioner, Brian Maughan, Carrie Blumert, and Kevin Calvey has made public and private statements admitting that the jail is dangerous, and these statements have been made throughout each of their services as members of the Board of County Commissioners.

90.     Defendants six (6) through fifteen (15) have each made public and private statements admitting their knowledge of the dangers created to inmates caused by underfunding and understaffing.

91.     Brian Maughan, Carrie Blumert and Kevin Calvey, have each received actual notice from jail personnel and members of the Jail Trust about the dangers associated with the under-funded and under-staffed jail.

92.     Brian Maughan, Carrie Blumert, and Kevin Calvey, each have actual notice of the unconstitutional conditions related to under-staffing and under-funding at the Oklahoma County Detention Center for many years.

93.     Carrie Blumert and Kevin Calvey have spoken publicly and privately indicating their knowledge of the unconstitutional conditions related to under-staffing and under-funding at the Oklahoma County Detention Center.

15

94.    Brian Maughan has also made public and private statements admitting his knowledge of the unconstitutional conditions related to under-staffing and under-funding at the Oklahoma County Detention Center.

95.    The Board of County Commissioners of Oklahoma County has been sued multiple times over the last 15 years for inmate-on-inmate violence, and these lawsuits provide notice to the Board members of the threat of violence.

96.    Local media publishes information regularly about inmate-on-inmate violence at the Oklahoma County Detention Center, and it is a matter of general public knowledge.

97.    Former Sheriff, John Whetsel, has spoken to each of the Board members individually, both past and present, and in open meetings about the lack of funding, and the resultant lack of staffing and the dangers that it creates for inmate-on-inmate violence.

98.    Former Sheriff, P.D. Taylor, has spoken to each of the Board members individually, both past and present, and in open meetings about the lack of funding, and the resultant lack of staffing and the dangers that it creates for inmate-on-inmate violence.

99.    Defendants six (6) through fifteen (15) have each made public admissions indicating their knowledge of the unconstitutional conditions related to under-staffing and under-funding at the Oklahoma County Detention Center.

100.    As early as 1995, an Oklahoma County Grand Jury was called, in part, to investigate issues at the Oklahoma County Detention Center.

101.    In the report issued by the 1995 Oklahoma County Grand Jury, the Oklahoma County Detention Center was criticized for lack of supervision of inmates in the pods.

16

102.    This lack of supervision is a direct result of lack of funding for detention officer positions.

103.    In 2002, at the request of the Board of County Commissioners of Oklahoma County due to underfunding, understaffing, and lack of supervision at the jail, the "Primary 9" committee was formed by the Board of County Commissioner to investigate the Oklahoma County Detention Center.

104.    The Primary 9 committee members found that the Oklahoma County Detention Center was underfunded, understaffed, and lacked appropriate supervision of inmates in the pods.

105.    In 2003 to 2007, Board of County Commissioners of Oklahoma County hired Facility Group to investigate how to properly fund the jail based on their knowledge of the unconstitutional conditions at the jail caused by underfunding, understaffing, and lack of appropriate supervision of inmates in the pods.

106.    In 2006 to 2008, and continuing to this date, the Department of Justice has investigated conditions at the Oklahoma County Detention Center and found that underfunding, understaffing, and lack of appropriate supervision of inmates in the pods created unconstitutional conditions of confinement and raised the likelihood of inmate-on-inmate violence, inter alia.

107.    After the Department of Justice report, which was issued in 2008, the Board of County Commissioners created the ADAC committee to investigate the Oklahoma County Detention Center, and to determine means and methods to correct issues with overcrowding, understaffing, and underfunding at the Oklahoma County Detention Center.

17

108.    Once again, the Board of County Commissioners of Oklahoma County was told, by the ADAC committee, that the Oklahoma County Detention Center was underfunded, understaffed, and dangerous to inmates and staff and that the risk of violence to both inmates and staff was unconstitutionally high.

109.    Each of the aforementioned committees' results were shared in open meeting with the members of the Board of County Commissioners of Oklahoma County.

110.    The Oklahoma State Department of Health conducts annual (and unannounced) visits to the Oklahoma County Detention Center in order to determine if the facility is meeting minimum standards.

111.    On each of the following dates, the Oklahoma State Department of Health found that the facility was understaffed in their inspection of the Oklahoma County Detention Center:  7-22-2016; 1-26-2017; 11-30-2017; 9-04-2018; 6-05-2019; 2-18-2020; 4-05-2020.

112.    The violation reports listed in the preceding paragraph are presented to the Board of County Commissioners at open meetings, and they are made aware of the contents of these violation reports.

113.    The dates outlined in the preceding paragraphs indicate that are far back as 1995, for a period of over 27 years, the Board of County Commissioners has been aware of the problems with under-staffing and under-funding.

114.    In February 2021, Greg Williams, Oklahoma County Detention Center Administrator, hired Ryan Correctional Services (RCS) to inspect the Oklahoma County

Detention Center and to provide insight into how to improve conditions at the Oklahoma County Detention Center.

115.    RCS found that "it was clear and convincing that the present level of staffing was insufficient for a safe and secure jail".

116.    RCS found that a detention officer assigned to a pod control booth "who makes only hourly rounds of looking into cells with no such coverage at all at night was beyond comprehension (and this was assuming that there is actually an officer in the control booth of each pod, which is disputed by current detention officers).

117.    RCS found that "too much is adversely occurring in this environment (the jail) that is not being, in any way, controlled by staff.

118.    RCS found that because the "Emergency Phone System does not function, *and inmates are left alone overnight*, inmate safety *and jail security is in constant jeopardy*.

119.    RCS found that it is "impossible to effectively manage the inmate population when they are so short staffed, and that staff expressed "significant concerns" about an "overall lax approach to safety and security".

120.    RCS interviewed staff at the Oklahoma County Detention Center, and staff expressed that they had "significant concern" about lack of safety throughout the facility and things have gotten progressively worse since the jail trust took control.

121.    The members of the Jail Trust board are also made aware of these reports and discuss the issues involved in open meetings.

122.    The Board of County Commissioners of Oklahoma County also has the authority to earmark portions of funds going to the operation of the jail to be allotted to specific areas related to operation of the jail.

123.    Over the span of at least twenty-seven (27) years, the Board of County Commissioners of Oklahoma County, both past and present, has engaged in budgeting for jail operations that has created a custom and practice of failure to allot sufficient funding to safely operate the jail.

124.    Brian Maughan has admitted having knowledge of the dangers associated with the lack of funding for the Oklahoma County Detention Center, and as such he has displayed  a clear pattern of deliberate indifference to the dangers created by under-funding the jail, and the dangers created when the jail is under-staffed

125.    Carrie Blumert has admitted having knowledge of the dangers associated with the lack of funding for the Oklahoma County Detention Center, he has displayed   a clear pattern of deliberate indifference to the dangers created by under-funding the jail, and the dangers created when the jail is under-staffed.

126.    Kevin Calvey has admitted having knowledge of the dangers associated with the lack of funding for the Oklahoma County Detention Center, he has displayed   a clear pattern of deliberate indifference to the dangers created by under-funding the jail, and the dangers created when the jail is under-staffed.

127.    The constant and chronic under-funding and under-staffing of the jail creates an atmosphere of fear and tension by the inmates, and the lack of supervision creates opportunities for inmates to violate the rights of other inmates, and the Board of County

20

Commissioners, past and present, have been warned numerous times about this consequence.

128.   Johnny Altstatt faced conditions that clearly posed a "substantial risk of serious harm" at the hands of other inmates.

129.   The Board of County Commissioners, having knowledge of the "substantial risk of serious harm", "acted or failed to act despite his knowledge of a *substantial risk* of serious harm."

130.   As part of the original agreement with the Department of Justice, the Board of County Commissioners entered a Memorandum of Understanding ("MOU") with the Department of Justice. As part of the MOU, the Board agreed to "maintain in working order all cameras, alarms, and other monitoring equipment at the Jail."

131.   The practice of leaving inmates unrestrained and without supervision openly violated the Oklahoma Jail Standards:

> (c) Jailer posts shall be located and staffed to monitor all prisoner activity either physically or electronically and close enough to the living areas to respond immediately to calls for assistance and respond to emergency situations. A jailer shall be on duty at all times at each location where prisoners are confined or the observation shall be conducted by closed circuit TV. The location shall be equipped with an intercommunication system that terminates in a location that is staffed twenty-four (24) hours-a day and is capable of providing an emergency response.

*See* OAC 310:670-5-3(c). And while the jail standards do not define constitutional parameters, those standards "provide persuasive authority concerning what is required." *Lopez,* 172 F.3d at 761.

132.   Despite notice and opportunity to correct these deficiencies, and despite assurances that deficiencies would be corrected in fact, the Board of County Commissioners has continued to house inmates in unsupervised locations and has continued to a facility that is inadequate for the safe keeping of inmates, both of which directly lead to the injuries to Plaintiff Johnny Altstatt.

133.   Inmate-on-inmate violence is a "condition of confinement", and it has been established since 1995 that officials may be liable for injuries caused by such violence if they were deliberately indifferent to harmful or dangerous conditions that are causally connected to that violence. *See* <u>*Farmer v. Brennan*</u>, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811, 62 USLW 4446, *Lopez v. Lemaster,* 172 F.3d 756 (10th Cir. 1999), *Barney v. Pulsipher,* 143 F.3d 1299 (10th Cir. 1998).

134.   Records of the Oklahoma County Detention Center contain numerous examples of inmate-on-inmate violence in the last twenty-seven (27) years.

135.   The Oklahoma County Detention Center has a higher incidence of inmate-on-inmate violence per capita than the national average.

## IV.

## STATEMENT OF CLAIMS

### <u>CLAIM NO. 1</u>
### FAILURE TO PROTECT
### FOURTEENTH AMENDMENT
### 42 U.S.C. § 1983

136.   Plaintiff adopts and incorporates by reference the information outlined in paragraphs 1-135.

137.    Johnny Altstatt had a clearly established due process right to bodily integrity to be free from inmate-on-inmate violence. Defendants deprived Mr. Altstatt of that right by adopting policies and/or practices that substantially increased the risk of harm to an identifiable population of inmates by permitting or requiring jailers to house non-violent pretrial detainees in unsupervised locations with unrestrained inmates known to harbor a propensity for inmate-on-inmate violence.

138.    The Defendants enacted or enforced these policies or practices with indifference to the consequences.

139.    The acts or omissions of the Defendants violated the Fourteenth Amendment rights of Johnny Altstatt, actionable through 42 U.S.C. § 1983, for which the Defendants are liable to the Plaintiff.

## CLAIM NO. 2

### FAILURE TO PROTECT
### OKLAHOMA CONSTITUTION ART.2 §7
### *BOSH* CLAIM

140.    Plaintiff adopts and incorporates by reference paragraphs 1-139 as if fully set forth herein.

141.    Johnny Altstatt had a clearly established due process right to bodily integrity to be free from inmate-on-inmate violence.

142.    The Board of County Commissioners, and all other Defendants through its employees deprived Johnny Altstatt of that right by housing non-violent pretrial detainees in unsupervised locations with unrestrained inmates known to harbor a propensity for

inmate-on-inmate violence.  The acts or omissions of Board violated due process rights of Mr. Altstatt, actionable through *Bosh, supra,* for which Board is liable to the Plaintiff.

## CLAIM NO. 3

### INADEQUATE SUPERVISION
### FOURTEENTH AMENDMENT
### 42 U.S.C. §1983

143.    Plaintiff adopts and incorporates by reference paragraphs 1-142 as if fully set forth herein.

144.    Johnny Altstatt had a clearly established due process right to adequate supervision by jail staff in order to prevent instances of inmate-on-inmate violence that are either a highly predictable or plainly obvious consequence of the policies and practices enacted by the Defendants.

## CLAIM NO. 4

### INADEQUATE SUPERVISION
### OKLAHOMA CONSTITUTION ART. 2, §7
### *BOSH* CLAIM

145.    Plaintiff adopts and incorporates by reference paragraphs 1-144 as if fully set forth herein.

146.    Johnny Altstatt had a clearly established due process right to adequate supervision to prevent instances of inmate-on-inmate violence, and as demonstrated above, Board, through its employees or elected officials, enacted policies and practices that substantially increased the serious risk of harm to Mr. Altstatt from inmate-on-inmate violence consistent with the allegations set forth above for which the Board is liable to the Plaintiff pursuant to art. 2, §7 of the Oklahoma Constitution.

24

<u>**CLAIM NO. 5**</u>

**CONDITIONS OF CONFINEMENT
FOURTEENTH AMENDMENT, 42 U.S.C. § 1983**

147.    Plaintiff adopts and incorporates by reference paragraphs 1-146 as if fully set forth herein.

148.    Johnny Altstatt had a clearly established due process right to conditions of confinement that satisfy basic constitutional requirements for housing pretrial detainees in an adult local detention facility. Defendants violated that right by enacting policies or practices that, when taken together, deprived Johnny Altstatt of the right to be free from injury in violation of the Fourteenth Amendment.

<u>**CLAIM NO. 6**</u>

**CONDITIONS OF CONFINEMENT
OKLAHOMA CONSTITUTION, ART.2 §7
*BOSH* CLAIM**

149.    Plaintiff adopts and incorporates by reference paragraphs 1-148 as if fully set forth herein.

150.    Johnny Altstatt had a clearly established due process right to conditions of confinement that satisfy basic constitutional requirements for housing pretrial detainees in an adult local detention facility. Defendant Board, through its employees or elected officials, violated that right by enacting policies or practices that, when taken together, deprived Mr. Altstatt of the right to life and liberty in violation of the Oklahoma constitution for which the Board is liable to the Plaintiff.

## CLAIM NO. 7

## INDIVIDUAL CLAIMS AGAINST ALL DEFENDANTS

151.    Plaintiff adopts and incorporates by reference paragraphs 1-150 as if fully set forth herein.

152.    Individual liability under section 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." *Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir.1997).

153.    "A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement."  *Meade v. Grubbs*, 841 f.2d 1512, 1528 (10th Cir. 1988).

154.    Under the standard set out in *Ashroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."

155.    Each named Defendant has had actual notice of the dangerous conditions at the Oklahoma County Detention Center, and each Defendant has created a policy that ensures that these dangerous conditions continue.

## REQUEST FOR RELIEF

156.    Based on the foregoing allegations, the Plaintiff respectfully requests the following:

A.      Plaintiff requests compensatory damages against all Defendants in an amount that exceeds $75,000.00;

B.      Plaintiff requests punitive damages against each Defendant in their individual capacity in an amount that exceeds $75,000.00;

C.      Nominal damages against all Defendants;

D.      Declaratory judgment determining that Defendants' acts or omissions violated the constitutional rights of Johnny Altstatt.

E.      An award of reasonable attorney's fees and costs;

F.      Any other relief permitted by law;

G.      Any other relief the Court deems just and equitable.

Respectfully submitted,


s:/R. Scott Adams
R. SCOTT ADAMS, OBA #13003
ADAMS & ASSOCIATES
401 N. Hudson Ave., Suite 100
Oklahoma City, OK 73102
Phone: (405) 232-9100:
Fax: (405) 232-9114
Email: sadams@scottadamslaw.com


Carl Hughes- OBA #4463
Kenneth Hughes #21706
1218 E. 9th Street, Suite 8
Edmond, Oklahoma 73034
(405) 848-0111
(405) 848-3507 fax
Email: carl.hughes@sbcglobal.net
Kenneth.j.hughes@sbcglobal.net

Sandra Elliott, OBA #11175
Elliott Law Center
15920 Red Stem Way
Edmond, OK 73013
(405) 625-0753 (cell)
(405) 604-0928 (off)
Elliottlaw7813@gmail.com


ATTORNEYS FOR PLAINTIFF

JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED.