## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BILLY JOE ALSTATT, as brother and    )
Guardian of JOHNNY ALSTATT, an       )
incapacitated person,                )
                                     )
      Plaintiff,                 )
                                     )
v.                                   )    Case No. CIV-22-811-D
                                     )
BOARD OF COUNTY COMMISSIONERS        )
FOR OKLAHOMA COUNTY; *et al.*,       )
                                     )
      Defendants.               )

## ORDER

This matter comes before the Court on the Motion to Disqualify Plaintiff's Counsel [Doc. No. 79], filed by Defendant Board of County Commissioners for Oklahoma County (the "County") pursuant to LCvR83.6(b) and Rules 1.9, 1.10, and 1.11 of the Oklahoma Rules of Professional Conduct.

The Motion is supported by evidentiary materials that include declarations of three individuals:  Commissioner Brian Maughan [Doc. No. 79-1], whose tenure began in 2009; Joe Blough, who has been a chief deputy to commissioners since 2007 [Doc. No. 79-14]; and Commissioner Myles Davidson, who previously served in deputy positions for other commissioners beginning in 2012 [Doc. No. 79-15].  The County presents facts to show that one of Plaintiff's attorneys, Sandra Howell-Elliott, was a career employee of the County who represented and advised the County regarding civil litigation and issues like those raised by Plaintiff's claims in this case.  The County claims Ms. Howell-Elliott has

a conflict of interest that disqualifies her from representing Plaintiff under Rule 1.9 and Rule 1.11 and, by imputation under Rule 1.10, disqualifies all Plaintiff's attorneys of record.

Plaintiff has filed a timely Response [Doc. No. 81] in opposition to the Motion, supported by the affidavits of Ms. Howell-Elliott [Doc. No. 81-1] and co-counsel Carl Hughes [Doc. No. 81-2].  Plaintiff contends Rule 1.11 governs the ethical duties of a former government lawyer and Ms. Howell- Elliott's representation does not violate that rule.  Plaintiff alternatively argues that Ms. Howell-Elliott's disqualification need not affect his other attorneys.  The Motion is fully briefed.  *See* Reply Br. [Doc. No. 86].[1]

## Standard of Decision

An order disqualifying an attorney in a pending case falls "within the supervisory powers of the trial judge, and is thus a matter of judicial discretion."  *Weeks v. Indep. Sch. Dist. No. I-89*, 230 F.3d 1201 (10th Cir. 2000) (quoting *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994)).  Attorneys appearing in this Court are bound by LCvR83.6(b), which adopts the Oklahoma Rules of Professional Conduct, but "because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law." *Cole*, 43 F.3d at 1383.  The Tenth Circuit has held that the Model Rules of Professional

---

[1] Plaintiff also contends the Motion should be denied as untimely.  *See* Resp. Br. at 25-26 (significant delay constitutes a "waiver" of request for disqualification).  The Court rejects this argument.  The Motion was filed before any substantive rulings in the case, while multiple motions to dismiss remained pending.  The Court finds that Plaintiff has not shown the County waived its objection to any conflict of interest.

Conduct adopted by the American Bar Association "reflect the national standard to be used in ruling on disqualification motions" and "case law applying ABA [rules] is instructive." *Id*. at 1383.[2]  As the party seeking disqualification, the County bears the burden to show that the attorney's conduct violated a disciplinary rule.  *Id*. at 1384.

**Statement of Facts**

The facts on which the Motion is based are largely undisputed.  Ms. Howell-Elliott was employed by the County as an assistant district attorney from July 1984 or 1985 until April 2015 or 2016, and worked for the County on a contract basis from July 2021 to May 2022 to assist with two criminal matters.[3]  During the last five years of her employment, Ms. Howell-Elliott led the civil division of the district attorney's office.  In this role, Ms. Howell-Elliott represented the County in civil rights litigation regarding the Oklahoma County Detention Center ("OCDC").  The County lists ten such cases filed between February 2008 and November 2014.  *See* Mot. at 11-12.

In addition to litigation services, Ms. Howell-Elliott provided legal advice to the county commissioners related to OCDC.  She attended both public board meetings and closed executive sessions convened for the purpose of confidential communications regarding pending civil litigation or claims.  The County has submitted minutes of board meetings held in 2012, 2013, and 2014 that reflect Ms. Howell-Elliott's involvement in

---

[2]  The Oklahoma Rules of Professional Conduct invoked by the County are identical to the corresponding ABA Model Rules.

[3]  Commissioner Maughan states Ms. Howell-Elliott's period of employment was July 1984 to April 2015; Ms. Howell-Elliott states the dates were July 1985 to April 2016.  This discrepancy is immaterial to the issues presented.

approving contracts and discussing funding or staffing issues related to OCDC.  During at least four meetings, executive sessions were held to address pending litigation and claims related to OCDC.  *See* Mot. Disqualify, Ex. 7, Aug. 1, 2012 Meeting Min. ¶ 50; Ex. 8, Dec. 3, 2012 Meeting Min. ¶ 29; Ex. 10, May 22, 2013 Meeting Min. ¶ 38; Ex. 13, July 16, 2014 Meeting Min. ¶ 33(a).

All three declarants for the County state they had confidential conversations with Ms. Howell-Elliott in her capacity as assistant district attorney and that some of those conversations included an exchange of information concerning funding and staffing of OCDC, "some of which is information that is not generally known."  *See* Maughan Decl. ¶ 18; Blough Decl. ¶ 20; Davidson Decl. ¶ 20.  All three state a belief that Ms. Howell-Elliott "would have been provided non-public, confidential, not generally known information about funding and staffing at [OCDC]" in representing the County in civil rights litigation regarding claims that OCDC "was allegedly under-staffed and/or under-funded."  *See* Maughan Decl. ¶¶ 19-20; Blough Decl. ¶¶ 21-22; Davidson Decl. ¶¶ 21-22. All state a belief that Ms. Howell-Elliott "is using information relating to her previous representation of Oklahoma County, the Board of County Commissioners of Oklahoma County, and any County-related individuals or entities, to the disadvantage of Oklahoma County, the Board of County Commissioners of Oklahoma County, and the relevant County-related individuals or entities."  *See* Maughan Decl. ¶ 21; Blough Decl. ¶ 23; Davidson Decl. ¶ 23.

Ms. Howell-Elliott admits that the County and its sheriff were her clients and that her duties included representing them "in lawsuits, including claims related to injuries or

conditions at [OCDC]."   *See* Howell-Elliott Aff. [Doc. No. 81-1], ¶ 3.   She specifically admits working with Commissioner Maughan while assigned to the civil division.   *Id.* ¶ 4. Ms. Howell-Elliott denies, however, that she "engaged in conversations with any county officer or employee about the funding of [OCDC], as funding was a matter of policy and was not a legal issue," and denies she was ever "asked by any officer or employee of the [County] or the Sheriff's Office . . . about funding decisions."   *Id.* ¶ 9.   Ms. Howell-Elliott states that, although she attended meetings of the County's budget board, all those meetings were open to the public and she was never "privy to any conversations about how the Budget Board made [funding] decisions."   *Id.*   Ms. Howell-Elliott states she does "not recall any cases the civil division handled that alleged inadequate funding as a ground for civil liability."   *Id.* ¶ 11.

Ms. Howell-Elliott admits she "personally handled several cases while assigned to the civil division that concerned inadequate staffing at the OCDC," but expresses a belief that "[t]hose cases were fact specific, and [she] would have inquired about staffing at the OCDC at or near the time of the complained of incident."   *Id.* ¶ 12.   Regarding her use of confidential information, Ms. Howell-Elliott states:

> In responding to lawsuits against the Sheriff and the [County] about the OCDC, I was able to access volumes of information about studies done at the jail from internet searches.   The internet has a large number of articles about studies done at the OCDC and about inhumane conditions at the OCDC.
>
> All the information contained in the Complaint and Amended Complaint filed herein is publicly accessible via internet research or PACER research.

I have never disclosed any information related to my representation of any [county commissioner] or any other county officer or county employee to any person other than perhaps co-counsel in the cases assigned to me while I was employed at the Oklahoma County District Attorney's Office.

*       *       *

I have had no conversations with [co-counsel in this case] related to any information about my representation of any former clients, including the [County], Sheriff, or other county clients, and I would never divulge any such information.

*Id.* ¶¶ 13-15, 18.

Ms. Howell-Elliott explains her involvement in this case as stemming from her relationship with Johnny Alstatt, whom she represented in his guardianship proceeding. *Id.* at ¶ 16. Ms. Howell-Elliott states that she is a sole practitioner with a home office and has no association with the law firms of Scott Adams or Carl Hughes. *Id.* Ms. Howell-Elliott reports that as of May 22, 2023, she has met with co-counsel about the case twice: initially with all attorneys of record while the guardianship was pending, where the discussions "were all about the Guardianship proceeding;" and a second time with Carl Hughes at his office. *Id.* ¶¶ 16-17. Mr. Hughes corroborates these facts, and attests that Ms. Howell-Elliott has not discussed her work as an assistant district attorney with co-counsel in this case or disclosed any confidential information gained through that work.

The claims asserted in this case under 42 U.S.C. § 1983 and state law concern injuries that Johnny Alstatt suffered as a pretrial detainee at OCDC in March 2021 and, specifically, inmate-on-inmate violence occurring within his cell. However, Plaintiff alleges that unsafe conditions existed in OCDC due to a shortage of detention officers and

6

understaffing of housing pods where cells are located.  Plaintiff's factual allegations describe a series of events in which Johnny Alstatt was physically threatened by his cellmate, placed a call for assistance, but was severely beaten and sexually assaulted before any response was made because there was no direct or indirect supervision of inmates in the pod or on the floor where he was housed.  Plaintiff alleges that a responding officer arrived during the assault but waited for additional officers to intervene, and that Johnny Alstatt was critically injured before they entered the cell.

As pertinent here, Plaintiff alleges that Commissioner Maughan "has made public and private statements about the extreme lack of funding at [OCDC], and the extreme damagers at [OCDC] created by the lack of funding," "public and private statements admitting that [OCDC] is dangerous," and "public and private statements admitting his knowledge of the unconstitutional conditions related to under-staffing and under-funding at [OCDC]."  *See* Am. Compl. [Doc. No. 35], ¶¶ 88-89, 94.  Commissioner Maughan allegedly had "actual notice of unconstitutional conditions related to under-staffing and under-funding at [OCDC] for many years."  *Id*. ¶ 92.

Factual allegations regarding notice include that the County "has been sued multiple times over the last 15 years for inmate-on-inmate violence" and that an Oklahoma County grand jury was called to investigate in 1995 and issued a report criticizing OCDC "for lack of supervision of inmates in the pods . . . [which] is a direct result of lack of funding for detention officer positions."  *Id*. ¶¶ 95, 100-01.  Also, the County formed a "Primary 9" committee to investigate OCDC in 2002 and the committee found that OCDC "was underfunded, understaffed, and lacked appropriate supervision of inmates in the pods."  *Id*.

¶¶ 103-04.  From 2003-2007, the County "hired Facility Group to investigate how to properly fund the jail based on their knowledge of the unconstitutional conditions" at OCDC related to these issues.  *Id.* ¶ 105. An investigation by the United States Department of Justice regarding OCDC from 2006-08 (which remains ongoing) resulted in a 2008 written report that found, among other things, "that underfunding, understaffing, and lack of appropriate supervision of inmates in the pods created unconstitutional conditions of confinement and raised the likelihood of inmate-on-inmate violence." *Id.* ¶ 106.  As a result of this report, the County created another committee to investigate OCDC and determine how to correct these issues, and this committee again told the County that OCDC "was underfunded, understaffed, and dangerous to inmates and staff and that the risk of violence to both inmates and staff was unconstitutionally high." *Id.* ¶ 108.  From these alleged facts, Plaintiff concludes that the County has been aware of the understaffing and underfunding problems at OCDC "for a period of over 27 years." *Id.* ¶ 113.

## Discussion

Rule 1.9 of the Oklahoma Rules of Professional Conduct – "Conflict of Interest: Duties to Former Clients" – covers generally a lawyer's responsibilities in representing a person whose interests are adverse to a former client.  Rule 1.11 – "Special Conflicts of Interest for Former and Current Government Officers and Employees" – addresses the specific situation presented here and provides the applicable standard, incorporating only

part of Rule 1.9.[4]  The Court therefore focuses on Rule 1.11, which provides as to former government employees as follows:

> (a) Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:
> (1) is subject to Rule 1.9(c); and
> (2) shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.
>
> \*      \*      \*
>
> (c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.  As used in this Rule, the term "confidential government information" means information that has been obtained under the governmental authority and which, at the time this Rule applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public.
>
> \*      \*      \*
>
> (e) As used in this Rule, the term "matter" includes:
> (1) any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties; and

---

[4]  *See* ABA Formal Op. 97-409 (1997) ("The conflict of interest obligations of a former government lawyer under the Model Rules of Professional Conduct are determined by Rule 1.11 and not by Rule 1.9(a) and (b)."); ABA Ann. Mod. Rules Prof. Cond. § 1.11 (10th ed. 2023) ("Rule 1.11 as amended in 2002 displaces Rule 1.9(a) and (b), which overlapped with it confusingly.").  Similarly, as to any imputed disqualification, the County relies on Rule 1.10, but this rule "is not applicable to the conflicts of interest addressed by this Rule [1.11]."  *See* ABA Mod. Rules Prof. Cond. § 1.11 cmt. 2.  If a former government lawyer is disqualified from a representation, Rule 1.11(b) governs the representation of the client by a law firm with which the lawyer is associated.

(2) any other matter covered by the conflict of interest rules of the appropriate government agency.

*See* Okla. Stat. tit. 5, ch. 1, app. 3-A.

Rule 1.9(c) provides:

A lawyer who has formerly represented a client in a matter . . . shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has been generally known; or
(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

*Id*.

## A.   Disqualification Under Rule 1.11(a)

The County asserts, first, that Ms. Howell-Elliott's representation of Plaintiff violates Rule 1.11(a) because she previously "participated personally and substantially as a public officer or employee" in other § 1983 cases involving similar claims.  *See* Reply Br. at 1.  This assertion invokes a categorial rule of disqualification in Rule 1.11(a)(2) that does not require a showing of access to or use of confidential information.

Upon consideration, the Court rejects the County's position regarding the scope of Rule 1.11(a)(2) under the facts of this case.  The County proposes to apply the provision broadly to civil rights litigation regarding jail conditions at OCDC that involved "similar claims."  *See* Mot. Disqualify at 11.  However, Rule 1.11(a)(2) does not disqualify a government lawyer from doing similar work after leaving public service but, instead, prevents the lawyer from switching sides in a "matter."  As pertinent here, Rule 1.11(e) defines "matter" as a judicial proceeding, claim, controversy, "or other particular matter

involving a specific party or parties."  Plaintiff's case concerns injuries to Johnny Alstatt
in March 2021, years after Ms. Howell-Elliott stopped working on civil litigation for the
County.  Clearly, her public employment did not involve personal participation in this
particular matter.

The County argues that the relevant "matter" encompasses a § 1983 action claiming
that a municipal policy of underfunding or understaffing OCDC created unconstitutional
conditions of confinement that caused injury to an inmate.  *See* Reply Br. at 2, 5-6.  The
County provides examples of § 1983 cases that run the gamut of civil rights claims by
detainees:  inadequate training of detention officers and failing to separate violent from
nonviolent detainees, *Dungee v. Bd. of Cnty. Comm'rs*, Case No. CIV-14-232-D, Compl.
(W.D. Okla. Mar. 10, 2014); inadequate medical or mental health care, *Beam v. Whetsel*,
Case No. CIV-13-1018-F, Compl. (W.D. Okla. Sept. 20, 2013); *Hamilton v. Bd. of Cnty.
Comm'rs*, Case No. CIV-11-1-D, Compl. (W.D. Okla. Jan. 3, 2011); and uses of excessive
force, *Lewis v. Bd. of Cnty. Comm'rs*, Case No. CIV-14-1305-HE, Am. Compl. (W.D.
Okla. Dec. 17, 2014).  The County's position that these are the same "matter" rests on the
nature of the § 1983 claim against it, that is, an established policy or custom that creates
municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91
(1978).  The alleged commonality is the same policy of "unconstitutional conditions of
confinement based on overcrowding, inadequate staffing, etc." or "understaffing and/or
underfunding" of OCDC.  *See* Reply Br. at 2, 5.[5]

---

[5]  In its Motion, the County advocates a broader "substantially related" standard under
Rule 1.9(a) that is absent from Rule 1.11(a).  *See* Mot. Disqualify at 13.  Rule 1.9(a) does not apply

The Court finds that a case the County cites as "remarkably similar" illustrates the flaw in its position. *See id*. at 6.  In *Green v. City of New York*, 10 CIV 214, 2011 WL 2419864 (S.D.N.Y. June 7, 2011), the municipal defendants moved to disqualify the plaintiff's attorneys in a § 1983 action alleging that a female detainee had been illegally strip-searched.  The lawyers were former city attorneys who had defended the city in class-action litigation regarding the lawfulness of strip-searches of pretrial detainees.  Both suits sought to impose municipal liability based on an unconstitutional policy or custom regarding strip-searches, and the individual plaintiff's complaint alleged that the policy had existed for decades.  The district court found that Rule 1.11 disqualified the lawyers from taking an adverse position in a matter where "the scope of the representation" involved advice on the same "highly relevant" subjects.  *See id*., 2011 WL 2419864 at *2.  The court also found the former city attorneys' participation in the prior litigation was substantial; although the lawyers were "relatively junior during their government service," they "reviewed training manuals and policy statements" on strip searches, "attended discussions with [high level officials] on risk management," and prepared individual employees to meet with opposing counsel.  *Id*.  Here, the County has not shown the same congruence between Ms. Howell-Elliott's past and present § 1983 cases, or her substantial participation in the prior cases.

---

to a former government lawyer.  *See supra* note 1.  Further, the County seems to concede in its reply that the former and current representation must involve the same matter.  There it argues that Ms. Howell-Elliott defended the County "in prior lawsuits arising from the same claims as those made in this lawsuit."  *See* Reply Br. at 2.

Admittedly, caselaw provides limited guidance because "[t]he scope of a matter is an intensely fact-specific inquiry." *See id*.[6] After careful consideration, however, the Court finds that the County has failed to demonstrate the cases on which Ms. Howell-Elliott worked during her tenure were the same matter. In this case, Plaintiff's § 1983 claim against the County alleges the existence of policy or custom of severe understaffing of detention officers at OCDC that created a constitutionally unsafe level of supervision of detainees and failed to provide adequate protection from inmate-on-inmate violence. While claims of understaffing at OCDC have been asserted in prior cases, the County has not identified any case in which Ms. Howell-Elliott defended it against a claim like the one asserted here.[7]

The County offers a "specific example" of Ms. Howell-Elliott's conflict based on her involvement in a 2014 case. *See* Reply Br. at 2. An allegation of OCDC understaffing by Dejuan Lewis was made in the context of a claim that the County had "failed to adequately and properly train and educate its [detention] officers in procedures to employ

---

[6] Some courts have adopted a "substantive test" for determining whether a government lawyer's work during and after his public service involved the same matter by "weighing the scope of the attorney's work in the first matter, the parties, the facts, and the time elapsed between the first and second matter." *See Great Divide Wind Farm 2 LLC v. Aguilar*, 426 F. Supp. 3d 949, 975 (D. N.M. 2019). A similar test is endorsed in commentary to the ABA Rules. *See* ABA Mod. Rules Prof. Cond. § 1.11, cmt. 10 ("In determining whether two particular matters are the same, the lawyer should consider the extent to which the matters involve the same basic facts, the same or related parties, and the time elapsed.").

[7] In addition to understaffing, Plaintiff complains of the County's alleged underfunding of OCDC's operations, and Ms. Howell-Elliott admits she served as an advisor to the budget board. However, budgeting decisions are not the type of "matter" encompassed by Rule 1.11(e). "A 'matter,' as specifically defined by Rule 1.11(e), does not include legislation, rulemaking, and other policy determinations." *See* Ann. Mod. Rules Prof. Cond. § 1.11 (10th ed. 2023).

13

when working in an understaffed and overpopulated environment." *See Lewis*, No. CIV-14-1305-HE, Am. Compl. ¶ 33.   Mr. Lewis alleged that two detention officers had deliberately used excessive force, or committed "malicious physical abuse," against him. *Id*. ¶ 29.   His pleading discussed the Department of Justice investigation of OCDC but, as to understaffing, relied on the alleged fact that the "investigation concluded and informed Defendants of the inadequacy of the jail's staffing and that that inadequacy contributed to the extraordinary number of uses of force against detainees" by detention officers. *Id*. ¶ 31. That is not the allegation here, nor is the same "understaffing" policy at stake.

The Court also notes that after Ms. Howell-Elliott retired, the operation of OCDC underwent a major change, as evidenced by publicly available information provided by the County in support of a motion to dismiss Plaintiff's Amended Complaint. *See* Def. Bd. Cnty. Comm'rs Renewed Mot. Dismiss, Ex. 1 [Doc. No. 41-1] (Trust Indenture Creating the Oklahoma County Criminal Justice Authority).   The County points out that "as of July 1, 2020, . . . the Oklahoma County Criminal Justice Authority assumed operational control of the OCDC." *See* Def. Bd. Cnty. Comm'rs Mot. Dismiss [Doc. No. 41] at 6. According to the County, at the time of the events in this case it "had no power to act with regard to jail operations," including staffing. *Id*.   In contrast, the operation and staffing of OCDC during Ms. Howell-Elliott's tenure was the responsibility of the county sheriff, who was the policymaker for jail operations.   Thus, as a factual and legal matter, it is unclear whether the same alleged policies remained in place.

For these reasons, the Court finds that the County has not shown Rule 1.11(a)(2) disqualifies Ms. Howell-Elliott from representing Plaintiff in this case.

## B.      Access to Confidential Information

The County also asserts that Ms. Howell-Elliott cannot represent Plaintiff because Rule 1.11(c) and Rule 1.9(c) prohibit her use of confidential government information that she acquired as a county employee, or use of nonpublic information relating to her prior representation of the County and its officers to the disadvantage of the County.  The County points to Ms. Howell-Elliott's work on § 1983 cases regarding OCDC, her confidential communications with Commissioner Maughn and other managerial employees regarding OCDC (as stated in their affidavits), and her participation in executive sessions of board meetings to engage in confidential discussions of litigation matters, including some of her § 1983 cases.  *See* Reply Br. at 3-4, 7.

### 1.      Use of Confidential Government Information

Rule 1.11(c) prohibits a former government lawyer from representing a private client under circumstances where the lawyer has "information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee" and the private client's "interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person."  The County does not identify any facts showing the application of this rule.  "Rule 1.11(b) [now Rule 1.11(c)] comes into play only if the lawyer acquired 'confidential government information' about an adverse third party while in government service, and offers no protection to the former government client respecting its confidences."  *See* ABA Formal Op. 97-409 (1997).  Here, the County does not contend Ms. Howell-Elliott obtained any government information about a third person that could be used to that person's

15

disadvantage in this case.   Therefore, the Court finds that Ms. Howell-Elliott is not disqualified under Rule 1.11(c).

### 2.      Use of Nonpublic Information from a Former Client

Rule 1.9(c), which is incorporated in Rule 1.11(a)(1), prohibits a lawyer from using "information relating to the representation [of a former client] to the disadvantage of the former client except . . . when the information has been generally known."  Information protected by this provision must be within the "actual knowledge" of the lawyer and not "information that merely could be imputed to the lawyer."  *See* ABA Mod. Rules Prof. Cond. § 1.11, cmt. 8.  As demonstrated by the competing affidavits submitted by the County and Plaintiff, the parties strongly disagree about whether Ms. Howell-Elliott obtained nonpublic information during her prior employment by the County that could be used to its disadvantage in this case.

The Court first notes that Commissioner Maughn and the other affiants for the County identify only general topics discussed with Ms. Howell-Elliott.  Although Plaintiff criticizes this approach, the Court is reluctant to demand more specific descriptions of their confidential communications.  The Tenth Circuit has stated that a party moving for disqualification need not reveal the substance of communications with a lawyer to prove a point, but may instead show a confidential communication was made by stating the circumstances and subject of the consultation.  *See Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1384, n.8 (10th Cir. 1994).

Even accepting the broad descriptions as sufficient, however, the Court finds that the only topics of confidential communications identified by the County related to this case

concern staffing and funding of OCDC.  *See* Maughan Decl. ¶ 18; Blough Decl. ¶ 20; Davidson Decl. ¶ 20.  For the reasons stated *supra*, the Court is not persuaded that these communications provided Ms. Howell-Elliott with confidential information that could be used to the County's disadvantage in this case.  Differences between Plaintiff's action and the cases on which Ms. Howell-Elliott previously worked, and changes in the operation of OCDC that have occurred in the interim, attenuate any information she obtained about staffing and funding of OCDC during her employment.

The County correctly points out, however, neither Plaintiff nor Ms. Howell-Elliott addresses a key part of her duties as legal advisor to the County.  During a two-year period from August 2012 to July 2014, Ms. Howell-Elliott participated on six separate occasions in closed, executive sessions pursuant to Okla. Stat. tit. 25, § 307(B)(4), to discuss litigation and claims against the County.[8]  At least four sessions concerned civil rights litigation regarding OCDC, including potential settlements.  The Court views Ms. Howell-Elliott's service to the County in this capacity as important to the proper application of Rule 1.9(c).

A thorough and persuasive analysis of a similar conflict-of-interest problem appears in *Carreno v. City of Newark*, 834 F. Supp. 2d 217 (D. N.J. 2011).  In that case, an arrestee brought a § 1983 action against a municipality alleging excessive force by the arresting officer.  The arrest occurred in July 2009; the suit was filed and removed to federal court

---

[8] This provision of the Open Meeting Act allows a public body to hold executive sessions for "the purpose of: . . . "4. Confidential communications between a public body and its attorney concerning a pending investigation, claim, or action if the public body, with the advice of its attorney, determines that disclosure will seriously impair the ability of the public body to process the claim or conduct a pending investigation, litigation, or proceeding in the public interest." Okla. Stat. tit. 25, § 307(b).

in July 2011.  From 2003 to 2009, the plaintiff's attorney was employed by the city "as chief in-house counsel for the Litigation Section" of its legal department.  In that role, "he was responsible for evaluating the merits of tort and civil rights cases filed against the City, personally defending the City and its police officers in countless civil rights cases, and supervising associate attorneys representing the City and its interests."  *Id*. at 220.  To support a *Monell*-based claim against the city, the complaint referenced a Department of Justice investigation into alleged "widespread and systemic civil rights failures" within the city's police department and alleged violations that "occurred, at least in part, when [the attorney] himself was the supervising Section Chief in the City's civil litigation section and was personally responsible for defending the City and its policies."  *Id*.

The city moved to disqualify the attorney on the grounds that he had a conflict of interest and was "engaged in prohibited side-switching."  *Id*.  Specifically, the city claimed the attorney had "high-level exposure to the confidential processes of the City's Litigation Department, both in terms of litigation and settlement strategy" and had access to confidential police department files that could be used against the city and the police officer.  *Id*. at 224.  The plaintiff "strenuously opposed the motion" and denied that his attorney had previously represented the officer or had access to confidential information that could be used in the case.  *Id*.  As pertinent here, the court ultimately found that the attorney "received confidential information in at least three forms:  (1) access to the City's confidential litigation strategies and processes; (2) access to the City's settlement processes and procedures; and (3) receipt and review of internal affairs investigations and files."  *Id*. at 229.  Because the attorney could use his knowledge of this information "to benefit his

current client, which would be an unfair advantage," and because he was taking an opposite position on *Monell* issues that were the same in his public and private cases, the court found that the attorney must be disqualified. *Id*. at 231-32. Only the first concern is present here because, under the Court's findings, the County has not shown the former and present cases involve the same matter.

Regarding litigation and settlement strategies, the district court in *Carreno* explained why the prior government service of the plaintiff's lawyer (Diego Navas) presented a conflict, in part, as follows:

> *a. Litigation Strategies and Processes*.  Navas was a decisionmaker for the City of Newark with respect to civil rights litigation.  One of the primary functions of Navas's prior representation of the City was to receive and review information and strategize about how to represent the City's interests.  This representation by its very nature provided Navas with access to confidential information that would not be available to other attorneys. For example, he would have information on how the City handled a claim or complaint upon receipt; how the City would investigate its officers; and how the course of investigation would proceed.  His defense of *Monell* claims would necessitate access to historical confidential information about the City's policies and practices and the police department's internal affairs records.  He would, by necessity, be privy to the City's internal and privileged evaluations regarding its susceptibility to civil rights claims.  No amount of discovery could even the playing field and place another attorney on the same footing as Navas; he has a special advantage and understanding of the City's confidential processes by virtue of his supervisory in-house role.
>
> *   *   *
>
> *b. Settlement Processes*.  Navas also had access to the City's confidential processes used to settle litigation.  Defendants' counsel submits certain memoranda prepared by Navas during his employment relating to the settlement of individual claims.  In some of these memoranda, Navas specifically discusses settlement of claims against the City; in others, he rejects settlement offers, adds and subtracts conditions to settlement, and recommends to Corporation Counsel whether claims should or could settle. Navas had deep exposure to the City's settlement processes, and directly

participated in the settlement of numerous claims.  He was aware of how the City values cases, and what would make the City more or less likely to settle.

Navas takes issue with Defendants' characterization of the settlement process, claiming that others in the City's Administration really controlled the process.  But, that actually proves Defendants' point.  No member of the public or regular attorney would be aware of the specific internal process the City used to evaluate the settlement of claims. . . .

*Carreno*, 834 F. Supp. 2d at 228-29 (record citations and footnotes omitted).

It is possible that these same concerns may apply to Ms. Howell-Elliott, given her supervisory role in the civil division of the district attorney's office and her service as a legal advisor regarding civil litigation and claims.  After careful consideration, however, the Court finds that the County has not carried its burden to demonstrate a conflict of interest based on Ms. Howell-Elliott's access to confidential information about litigation and settlement processes during her tenure.

First, unlike *Carreno*, the County has not shown that Ms. Howell-Elliott was the decisionmaker for the County regarding civil rights litigation or that she was responsible for overall litigation strategy and representation of the County's interests in civil rights matters.  It is not clear that Ms. Howell-Elliott's job responsibilities extended beyond the cases on which she was the attorney of record.  The fact that she was present during some executive sessions of board meetings does not explain her role in the litigation or settlement process.  Also, one fact highlighted in *Carreno* was that the Department of Justice's civil rights investigation occurred under the attorney's watch, while he "was personally responsible for defending the City and its policies."  *See Carreno*, 834 F. Supp. 2d at 220. The County has not shown that Ms. Howell-Elliott had a similar role in responding to the

Department of Justice's investigation of conditions at OCDC. She was not in charge of the civil division of the district attorney's office when the 2008 report was issued.

Second, there is a greater time lapse between Ms. Howell-Elliott's retirement and her representation of Plaintiff.[9] Unlike the attorney in *Carreno*, she was not working for the County at the time of the events in this case or when Plaintiff's claim was under investigation or consideration. In addition to the possible staleness of any confidential information she may have obtained while working on civil litigation and claims, the County has undergone a near-total change in leadership since her retirement. Only Commissioner Maughan remains in office. The County has two new commissioners, a new sheriff, and a new district attorney. This change in administration decreases the likelihood that any institutional information that Ms. Howell-Elliott obtained remains useful.

The County's effort to disqualify Ms. Howell-Elliott for having nonpublic information that could be used to its disadvantage in this case relies on the facts that she represented the County and its officers in civil rights litigation regarding OCDC and that she participated in executive sessions of the board of county commissioners to discuss such litigation. *See* Reply Br. at 2-3. The Court is not persuaded that these facts, alone, establish a violation of Rule 1.9(c).

---

[9] Johnny Alstatt was injured in 2021, and Plaintiff served the County with notice of a claim in February 2022, at least six years after Ms. Howell-Elliott retired. *See* Am. Compl. ¶ 24.

## Conclusion

For these reasons, the Court finds that the County has not shown the existence of a conflict of interest that disqualifies Ms. Howell-Elliott from appearing as counsel for Plaintiff in this case.

**IT IS THEREFORE ORDERED** that the Motion to Disqualify Plaintiff's Counsel [Doc. No. 79] is **DENIED**.

**IT IS SO ORDERED** this 7th day of August, 2023.

TIMOTHY D. DeGIUSTI
Chief United States District Judge