## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BILLY JOE ALTSTATT,                        )
                                           )
        Plaintiff,                         )
                                           )
v.                                         )       Case No. CIV-22-811-D
                                           )
BOARD OF COUNTY COMMISSIONERS              )
FOR OKLAHOMA COUNTY, et al.,               )
                                           )
        Defendants.                        )

## ORDER

Before the Court are the Motion for Summary Judgment of Defendant, Oklahoma

County Criminal Justice Authority [Doc. No. 128] and the Motion for Summary Judgment

of Defendant Board of County Commissioners of Oklahoma County and Brief in Support

[Doc. No. 130]. Plaintiff filed a response [Doc. No. 142], to which Defendants each replied

[Doc. Nos. 145, 147]. The matter is fully briefed and at issue.

### UNDISPUTED MATERIAL FACTS

#### A. Johnny Altstatt's Detention and Incident

Johnny Altstatt was booked into the Oklahoma County Detention Center (the Jail)

on March 4, 2021, on one charge of second-degree burglary [Def. OCCJA UMF No. 11].

Because he was classified as a "minimum" security risk, Mr. Altstatt was originally housed

in general population cell number 4A-20. *Id.* at 11-12. But he was subsequently transferred

to the mental health observation floor cell number 12C-18 due to his suicidal ideations. *Id.*

On March 10, 2021, Joseph DeFreeze was booked into the Jail for malicious injury

or destruction of property. *Id.* at 13. He was originally classified as a "minimum" security

1

risk, but was assigned to the mental health observation floor the next day [Def. The Board UMF Nos. 5, 17]. The following day, he was moved to cell number 12D-01. *Id.*

On March 15, 2021, at approximately 2:20 a.m., Detention Officer Corporal Michael Alleman received a call from "camera ops"—the unit that monitors the cameras in the Jail. *Id.* at 16. Corporal Alleman entered the 12 D block of cells but heard no commotion. *Id.* at 17.

He then moved to cell number 12D-01 and, through the cell door window, he saw Mr. DeFreeze on top of Mr. Altstatt repeatedly hitting him. *Id.* Corporal Alleman notified the individuals at camera ops that there was an inmate-on-inmate incident occurring and requested immediate assistance. *Id.* He then opened the food tray port and ordered Mr. DeFreeze to stop. *Id.* Mr. DeFreeze stopped hitting Mr. Altstatt, said something to Corporal Alleman, then resumed hitting Mr. Altstatt. *Id.* But Corporal Alleman could not open the cell door until other officers arrived to assist. *Id.* When other officers finally arrived, the cell was opened and Mr. DeFreeze was restrained. *Id.* Mr. Altstatt was taken to the hospital in an ambulance. *Id.* He suffered multiple broken ribs, a lung injury, facial fractures, and cuts that required intensive care [Doc. No. 142, at 2].

## B. Jail Conditions and Staffing Issues

In 2008, the U.S. Department of Justice issued an investigative report on the Jail's conditions of confinement. Among other findings, the DOJ found "actual direct supervision of detainees at the Jail is virtually non-existent. The facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety" [Doc. No. 142-1, at 4].

2

The report further noted that "[o]nly one or two detention officers are available to supervise the large number of detainees as well as to conduct detainee sight checks." *Id.*

The Oklahoma County Criminal Justice Authority (OCCJA) was created by Trust Indenture [Def. The Board UMF No. 1]. It was granted authority to own, operate, and manage Jail facilities for the benefit of Oklahoma County. *Id.* On July 1, 2020, the OCCJA took over physical operations of the Oklahoma County Detention Center. *Id.*

The Oklahoma State Department of Health (OSDH) conducts regular inspections of the Jail. In February 2021, the OSDH Jail Inspection Division (JID) conducted an annual inspection and investigation of the Jail [Doc. No. 142-2]. The JID found that the Jail was not in substantial compliance with Oklahoma Jail Standards, OAC Title 310, Chapter 670. The JID report cites to incidents of inmate deaths at the Jail and noted that the Jail staff did not meet the standard that "[s]taff assignments shall provide for backup assistance for all employees entering locations where inmates are confined." *Id.* at 8. Further, it noted that "tests of the emergency phone system showed that calls went unanswered when working, and as confirmed by staff, some phone systems do not work." *Id.*

In May 2021, the OCCJA employed the National Institute of Corrections (NIC) to perform an assessment shortly after the incident between Mr. Altstatt and Mr. DeFreeze. The report found that "[i]t was clear and convincing that the present level of staffing was insufficient for a safe and secure [J]ail[,] . . . the [Jail] has had to reduce requirements and/or cut corners to seek applicants and hires[, and] . . . the operational staff have expressed concern that these new personnel lack the basic skills to be a detention officer" [Doc. No. 142-3, at 17-18]. The report recommended that "[t]he [Jail] needs to move to a

3

direct supervision model as quickly as possible [and] . . . [i]n the meantime, there needs to be every effort made to have constantly moving teams of, at least, two detention officers entering pods and observing inmates in and out of cells day and especially at night." *Id.* at 28.

Throughout 2022 and 2023, a Multicounty Grand Jury convened to investigate the "repeat deficiencies" within the Jail. Among other findings, the grand jury report found that "the former Chief Executive Officer of the [Jail] did not take proactive or effective steps to curb significant death rate in the [J]ail [and] . . . believes that inadequate staffing, funding surveillance, and training, coupled with poor law enforcement protocols, led to the significant loss of life within the [J]ail" [Doc. No. 142-4, at 9].

Tiffany Carter was the Chief of Security at the Jail. She testified that when the trust took over control of the Jail, her position became inconsistent—she notes confusing cross-supervision and that she was often reassigned to various other duties other than those assigned to her as a captain [Doc. No. 142-16, at 27-31]. Further, she testified that once the Jail trust took over, there were more employees working the day shift than the night shift. *Id.* at 32-33.

Greg Williams, the administrator of the Jail, testified regarding the staffing shortages at the Jail [Doc. No. 142, at 19]. Specifically, he acknowledged that the Jail was understaffed, and the less staff present the more dangerous the situation was. *Id.* He explained that they did not have adequate staffing because they could not keep enough employees. *Id.* at 20. Mr. Williams testified that a lack of funding did not cause the low staffing numbers. *Id.* But he further testified that he asked the Board for more funding every

chance he could get and that he could not adequately perform his job due to a lack of funding. *Id.*

Sue Ann Arnall, a former trustee for the OCCJA, testified about the lack of authority given to the Jail trust to manage finances [Doc. No. 142, at 28]. She also testified as to the decrease in the number of detention officers from June 2020 to April 2021. *Id.* at 29. Ms. Arnall stated that she requested additional funding from the Board to address staffing, maintenance, and operational issues, but was denied any assistance. *Id.* She further acknowledged that the facility is not adequately staffed to safely secure the detainees—similar to the findings in the DOJ's letter from 2008. *Id.* at 30.

Finally, Corporal Alleman testified in his deposition that the Jail was dangerous because of the low staffing levels. He further agreed with the findings in the assessment conducted by the NIC.

**STANDARD OF DECISION**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.* at 255. The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

5

must prevail as a matter of law." *Id.* at 251-52.

## DISCUSSION

### I.    Legal Framework—Municipal Liability Under 42 U.S.C. § 1983

Plaintiff, Billy Joe Altstatt, asserts claims on behalf of his brother, Johnny Altstatt, under 42 U.S.C. § 1983, alleging that Mr. Altstatt's rights were violated while detained at the Jail. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Generally, a local government may not be held liable under § 1983 "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). Rather, where a plaintiff seeks to hold a local governmental entity liable under § 1983, he must also show that a municipal policy or custom "was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). Specifically, a plaintiff must demonstrate 1) an official policy or custom; 2) causation; and 3) deliberate indifference. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023).

### II.    Underlying Constitutional Violation

The Constitution imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation omitted). Indeed, "[h]aving incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of

6

virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (internal quotation marks and citation omitted) (alterations in original). Of course, the mere fact that a prisoner suffered injury at the hands of another prisoner does not "translate[] into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 824. Rather, to prevail on a failure to protect claim, a plaintiff must show "that he was incarcerated under conditions posing a substantial risk of serious harm," and the defendant acted with deliberate indifference, meaning the defendant "was aware of and disregarded an excessive risk to inmate health or safety by failing to take reasonable measures to abate the risk." *Lopez v. LeMaster*, 172 F.3d 756, 761 (10th Cir. 1999) (internal quotation and citation omitted).

In its motion, the OCCJA argues that Plaintiff has failed to establish Mr. Altstatt was "incarcerated under conditions posing a substantial risk of serious harm." *See Lopez*, 172 F.3d at 760. The OCCJA contends that claims arising from inmate-on-inmate violence generally require evidence of one of the following: (1) evidence of direct threats to the victim leading up to the violent incident; (2) evidence that the victim was particularly vulnerable to attacks by other inmates because of some personal characteristic or membership; or (3) evidence the assailant had a recent history of violent or disruptive behavior [Def. Motion, at 16]. Further, the OCCJA asserts that Plaintiff has no evidence of any of the above three things, and without any proof of notice of probable violence by either Mr. DeFreeze or Mr. Altstatt, there cannot be deliberate indifference.

The OCCJA presents an overly restrictive view of the relevant case law and

7

misconstrues Plaintiff's claim. First, knowledge of specific threats or an inmate's individual risk is not necessarily required. *See Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation faces such a risk."); *see also Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur."); *Lopez*, 172 F.3d at 762 n.5 ("Even if Sheriff LeMaster was unaware of the specific risk to appellant from his cellmates, this does not relieve him from liability.").

Plaintiff's claim against Defendants is largely premised on the argument "that the conditions of confinement at the Jail caused serious and permanent injuries to Johnny Altstatt and deprived him of his fundamental constitutional right to safety and bodily integrity in pretrial custody" [Doc. No. at 3]. Plaintiff attributes this failure to Defendants' longstanding history of understaffing the Jail and a systemic failure to address the known problems. Accordingly, the assertion that Mr. Altstatt and Mr. DeFreeze did not have a history of being violent with Jail staff or other detainees does not absolve Defendants of liability.

Upon consideration of the summary judgment record, the Court finds that a reasonable jury could conclude that Mr. Altstatt's constitutional rights were violated by a systemic failure. Courts have held that a systemic failure can serve as the underlying constitutional violation for purposes of *Monell* liability. *See Lucas,* 58 F.4th at 1144 ("[I]t

was error for the district court to not consider a systemic failure as the underlying constitutional violation."). "Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). However, there is a limited exception to the individual action requirement "where the alleged violation occurred as a result of multiple officials' actions or inactions." *Id.*

In this case, Plaintiff has set forth evidence that severe understaffing and underfunding at the Jail were longstanding and pervasive problems, known to the OCCJA and Jail staff, and that the OCCJA knew that this posed excessive risk of inmate-on-inmate violence. Additionally, there is sufficient evidence for a reasonable jury to infer that an excessive risk of inmate-on-inmate violence—paired with severely low staffing levels— would make it impossible for Jail staff to reasonably respond to inmate distress calls.

The OCCJA further argues that Plaintiff's constitutional violation claim is not consistent with § 1983 and violates the Tenth Amendment. Particularly, the OCCJA contends that this Court should not follow Tenth Circuit precedent in *Crowson v. Washington Cnty.*, 983 F.3d 1166 (10th Cir. 2020) and *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127 (10th Cir. 2023).

Turning first to *Crowson*, the OCCJA asserts that the Tenth Circuit incorrectly dispensed with the first two elements required when asserting a claim under § 1983. On the first element, the OCCJA argues that *Crowson* eradicated the need to establish that an employee's acts or omissions violated a constitutional right and replaced it with the requirement that only negligence of multiple government employees occurred. Further,

the OCCJA contends that *Crowson* incorrectly eliminated the need to establish a causal connection between a constitutional violation of an employee and policies and practices of the municipality. The OCCJA next argues that *Lucas* expanded municipal liability to include private contractors who are part of the medical care delivery system.

In support of its argument that this Court should not follow Tenth Circuit precedent, the OCCJA cites the factors that the Supreme Court of the United States uses in determining whether it should overrule its own precedent. The Court rejects the OCCJA's argument and abides by binding Tenth Circuit precedent.

Viewing all facts and reasonable inferences in favor of Plaintiff, the Court finds that Plaintiff has demonstrated disputed material facts with respect to whether Mr. Altstatt suffered an underlying constitutional violation.

### III.    Municipal Liability—OCCJA

As stated above, to establish municipal liability for a constitutional violation, a plaintiff must demonstrate (1) an official policy or custom; (2) causation; and (3) deliberate indifference. *See Lucas*, 58 F.4th at 1145 (10th Cir. 2023). Rather than address each of these, the OCCJA lists three reasons why it is entitled to summary judgment: Plaintiff does not have evidence of a custom, policy, or practice that violated Mr. Altstatt's constitutional rights; there was no failure to protect; and there was no systematic failure related to Mr. Altstatt's altercation with Mr. DeFreeze.

The OCCJA's argument regarding the three elements of municipal liability is limited to assertions that Plaintiff provides no proof of any inadequacy of staffing that would have changed the incident complained of because there is no expert testimony, Plaintiff provides

no proof of additional funding, and Plaintiff provides no proof more staffing would have changed the outcome.

Plaintiff provides deposition testimony and various reports all asserting that the Jail was inadequately staffed. Specifically, the report from the Multicounty Grand Jury states that "the former Chief Executive Officer of the [Jail] did not take proactive or effective steps to curb significant death rate in the [J]ail [and] . . . believes that inadequate staffing, funding surveillance, and training, coupled with poor law enforcement protocols, led to the significant loss of life within the [J]ail" [Doc. No. 142-4, at 9]. Further, the NIC's report found "clear and convincing that the present level of staffing was insufficient for a safe and secure [J]ail" [Doc. No. 142-3, at 17-18]. Plaintiff also provides considerable deposition testimony from Ms. Carter, Mr. Williams, Ms. Arnall, and Mr. Alleman discussing the understaffing of the Jail and its repercussions. This evidence rebuts the OCCJA's assertions that Plaintiff lacks proof on the three above-mentioned items.

Viewing all facts and reasonable inferences in the light most favorable to Plaintiff, a jury could conclude that a violation of a pretrial detainee's Fourteenth Amendment rights is a plainly obvious consequence of the purported customs of understaffing and underfunding, and that the OCCJA was deliberately indifferent to conditions at the Jail. For these reasons, the Motion for Summary Judgment of Defendant, Oklahoma County Criminal Justice Authority [Doc. No. 128] is **DENIED**.

## IV.    Municipal Liability—Board of County Commissioners for Oklahoma County (the Board)[1]

With respect to the Board, the Court has previously rejected the notion that the Board cannot be held liable as a matter of law merely because the Jail is operated by the sheriff or, in this case, the OCCJA. *See Kauble v. Bd. of Cnty. Comm'rs of Okla. ex rel. Okla. Cnty. Sheriff's Off.*, Case No. CIV-17-729-D, 2018 WL 912285, at *3-4 (W.D. Okla. Feb. 15, 2018) ("Under Oklahoma law, a county is a suable entity that is sued through its board of county commissioners. . . . [D]etermining a party's responsibility for a policy that leads to a federal rights violation involves a fact-specific inquiry, and although a county's sheriff has charge and custody of the Jail, the board of commissioners sets policies, including fiscal policies, that may be implicated in a violation of a county inmate's federal rights.").

Next, the Board argues that its only policy-adjacent role with the Jail was setting the county budget and allocating funds. It further contends that the Board is obligated to provide funding for other constitutional obligations, not just the Jail. Finally, it asserts that the Board's budgeting and funding process is complex and requires the input of many different interests. Plaintiff provides ample deposition testimony from several individuals who testified that the lack of funding and understaffing create an unsafe environment at the

---

[1] The Board objects to the four reports Plaintiff submits with his response to the Board's motion for summary judgment. The Court finds that even absent the reports, Plaintiff has raised genuine disputes of material fact ripe for jury determination through deposition testimony alone. Further, the Court finds that the reports are relevant for the purpose of establishing the Board's knowledge of the understaffing and underfunding of the Jail. Additionally, the Court believes the documents could be properly authenticated and admitted under the Federal Rules of Evidence.

Jail. Specifically, Plaintiff provides deposition testimony from Ms. Carter, Mr. Williams, Ms. Arnall, and Mr. Alleman who all testified regarding the understaffing of the Jail. Further, several of these individuals testified as to the consequences of the Jail's understaffing, especially in terms of the safety of the detainees.

In viewing the summary judgment record in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find the lack of funding was the result of the Board's failure to properly allocate sufficient funds to the Jail for it to be safely operated.

As stated above, to establish municipal liability for a constitutional violation, a plaintiff must demonstrate (1) an official policy or custom; (2) causation; and (3) deliberate indifference. *See Lucas*, 58 F.4th at 1145 (10th Cir. 2023).

### a. Official Policy or Custom

An official policy or custom may take many forms, to include "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239-40 (10th Cir. 2020) (quoting *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017)).

The Board contends that "a 'policy,' for § 1983 purposes, is a specific directive related to a specific topic that bears out a specific constitutional outcome" [Doc. No. 130, at 24]. It argues that a generic municipal budget that is facially reasonable "is not a specific directive related to a specific topic that bears out a specific constitutional outcome" [Doc.

No. 130, at 25]. Therefore, the Board contends Plaintiff cannot prove the existence of a policy.

Plaintiff responds to the Board's argument by contending that the longstanding policy or custom of understaffing and underfunding the Jail and the failure of the Jail to take reasonable steps to decrease inmate-on-inmate violence is evident. Specifically, he points to the 2008 DOJ report, the OSDH report, the NIC report, and the Multicounty Grand Jury report.

In pointing to the DOJ report, Plaintiff cites to several portions where the report concluded that direct supervision of the detainees is virtually nonexistent and the facility is not adequately staffed to ensure the safety of detainees. Further, he asserts that this report shows the Board was aware of the issues the DOJ pointed out—including understaffing— yet these issues were never resolved. Plaintiff also points to several deficiencies of the Jail revealed in the three other reports.

Viewing all facts and reasonable inferences in the light most favorable to Plaintiff, a jury could conclude that the Board maintained an official policy or custom of understaffing and underfunding the Jail.

### b. Causation

"To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013) (citation omitted).

The Board asserts that Plaintiff's claim requires the testimony of an expert witness which Plaintiff fails to provide. It argues that Plaintiff's claim requires "this Court and a

14

jury to bridge the gap between the 2020-2021 fiscal year budget and Mr. Altstatt's late-in-time injury with pure speculation" which cannot be done absent an expert witness [Doc. No. 130, at 27]. Further, the Board argues that the funding process and funding decisions are so complex that expert testimony is required.

In response, Plaintiff asserts that the instant incident was not isolated, rather it was foreseeable and an inevitable consequence of long-standing policies of Defendants. He points to deposition testimony from Corporal Alleman where he testified that he did not immediately enter the cell where the altercation between Mr. DeFreeze and Mr. Altstatt was occurring because there was not a second officer present. Plaintiff contends that this illustrates the direct link between staffing policies and the failure to prevent the assault because the conditions posed a substantial risk of serious harm to Mr. Altstatt.

Upon careful consideration of the summary judgment record, the Court finds that a reasonable jury could determine that the Board's custom or policy was closely related to Mr. Altstatt's injuries.

### c. Deliberate Indifference

Deliberate indifference in the municipal liability context "may be satisfied when the [defendant] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Layton v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, 512 F. App'x 861, 871 (10th Cir. 2013) (unpublished); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of

15

it."). Although notice is typically established "by proving the existence of a pattern of tortious conduct," deliberate indifference may also be found "absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Barney*, 143 F.3d at 1307-08 (quotation marks and citation omitted).

The Board contends that Plaintiff has no evidence to point toward the Board's state of mind in approving and issuing the 2020-2021 fiscal year budget. Therefore, Mr. Altstatt has no evidence to create a fact question as to whether the Board acted with deliberate indifference.

In response, Plaintiff provides deposition testimony from Ms. Carter, Mr. Williams, Ms. Arnall, and Mr. Alleman. Each individual testified about the history of unsafe conditions at the Jail due to its understaffing and underfunding. For example, Ms. Arnall specifically testified that "[t]he facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety" [Doc. No. 142, at 23]. Ms. Carter testified that the more staff that is present, the safer it is for everyone at the Jail. *Id.* at 15. Specifically, when asked in her deposition "[i]t is actually dangerous, isn't it, when the staff levels are that low," she responded "[y]es." *Id.* at 18. Mr. Williams testified that he asked the Board for additional funding every chance he got because the funding authorized was insufficient to meet the Jail's needs. *Id.* at 20.

Viewing all facts and reasonable inferences in the light most favorable to Plaintiff, a jury could conclude that a violation of a pretrial detainee's Fourteenth Amendment rights is a plainly obvious consequence of the purported customs of severely understaffing and

underfunding the Jail. For these reasons the Motion for Summary Judgment of Defendant Board of County Commissioners of Oklahoma County and Brief in Support [Doc. No. 130] is **DENIED**.

## CONCLUSION

The Motion for Summary Judgment of Defendant, Oklahoma County Criminal Justice Authority [Doc. No. 128] is **DENIED**. The Motion for Summary Judgment of Defendant Board of County Commissioners of Oklahoma County and Brief in Support [Doc. No. 130] is also **DENIED**.

**IT IS SO ORDERED** this 16th day of March, 2026.

TIMOTHY D. DeGIUSTI
Chief United States District Judge

17